JOSEPH A. GUTIERREZ, ESQ.
Nevada Bar No. 9046
DANIELLE J. BARRAZA, ESQ.
Nevada Bar No. 13822
**MAIER GUTIERREZ & ASSOCIATES**
8816 Spanish Ridge Avenue
Las Vegas, Nevada 89148
Telephone:  702.629.7900
Facsimile:  702.629.7925
E-mail:      jag@mgalaw.com
             djb@mgalaw.com

*Attorneys for Plaintiff Lavanita Burke*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LAVANITA BURKE, individually,<br><br>Plaintiff,<br><br>vs.<br><br>CLARK COUNTY PARK POLICE, a political subdivision; DOES I-X; and ROE BUSINESS ENTITIES I-X, inclusive,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT** |

## COMPLAINT WITH JURY DEMAND

Plaintiff LAVANITA BURKE ("Plaintiff" or "Ms. Burke"), by and through her attorneys of record, the law firm MAIER GUTIERREZ & ASSOCIATES, hereby demands a trial by jury and complains and alleges against CLARK COUNTY PARK POLICE, a political subdivision ("Park Police"); and DOES I-X; and ROE BUSINESS ENTITIES I-X, inclusive (collectively, "Defendants") as follows:

## JURISDICTION, VENUE AND LEGAL BASIS FOR THIS ACTION

1.      This Court possesses jurisdiction over the matter under 28 U.S.C. § 1331 because Plaintiff's claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 since "a substantial part of the events or omissions giving rise to the claim[s] occurred" in Nevada.

1

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

3.      On or about October 22, 2015, Plaintiff filed a formal charge of discrimination with the Nevada Equal Rights Commission ("NERC").  This filing with NERC, which was concurrently filed with the Equal Employment Opportunity Commission ("EEOC"), fulfilled Plaintiff's obligation to initiate an administrative claim before seeking review in this Court.

4.      In the NERC filing, Plaintiff alleged facts demonstrating that she had been subjected to sexual harassment, racial discrimination, and retaliation by Plaintiff's former employer, Clark County Park Police, in violation of public policy.

5.      On or about June 2, 2017, the EEOC issued Plaintiff a "Dismissal and Notice of Rights" letter stating that she would have within 90 days of the letter's receipt to file suit.

6.      Plaintiff has met all administrative prerequisites to bring this lawsuit.

**PARTIES**

7.      Plaintiff LAVANITA BURKE ("Ms. Burke") is, and at all times pertinent hereto was, a resident of Clark County, Nevada.

8.      Upon information and belief, defendant CLARK COUNTY PARK POLICE ("Park Police") is, and at all times pertinent hereto was, a political subdivision of the State of Nevada, and is authorized to do business in Clark County, Nevada.

9.      The true names and capacities, whether individual, corporate, associate, partnership or otherwise, of the defendants herein designated as DOES I through X and ROE CORPORATIONS I through X, inclusive, are unknown to plaintiff, who therefore sues said defendants by such fictitious names.  Plaintiff will seek leave of the court to insert the true names and capacities of such defendants when the same have been ascertained and will seek further leave to join said defendants in these proceedings.

**GENERAL ALLEGATIONS**

10.      On or around March 2, 2015, Park Police hired Ms. Burke as a police officer.

11.      Prior to obtaining the police officer position at Park Police in 2015, Ms. Burke already had over 10 years of experience working as a police officer in Detroit, Michigan.  Thus, Ms. Burke was fully familiar with the equipment associated with the job and how such equipment should be

2

properly worn and fitted, including the duty belt, bulletproof vest, and other necessary equipment.

**SEXUAL HARASSMENT AND RACIAL DISCRIMINATION AT PARK POLICE**

12.    Ms. Burke endured both racial discrimination and sexual harassment for the duration of her employment at Park Police, and suffered from retaliation after she got up the nerve to voice her concerns regarding this misconduct.

13.    During her time at Park Police, Ms. Burke was the only African American officer and the only female officer, meaning she was a double minority.

14.    Ms. Burke was the subject of countless incidents of obscene, inappropriate, and illegal conduct by her manager at Park Place, Commander Roy Michael ("Commander Michael").

15.    From the very beginning of Ms. Burke's employment, Park Place (mostly through Commander Michael) took steps to single Ms. Burke out in a negative way based on her status as a woman and as an African American, making her extremely uncomfortable.

16.    For example, Commander Michael consistently referred to Ms. Burke as the token "black female," or "the black female from Detroit."  It became a running joke amongst the other officers, who taunted her and treated her as less than an equal because Commander Michael had made it clear that he only hired Ms. Burke to make Park Place look more diverse, not because she was actually qualified for the position, despite her long-standing history as an officer in Detroit.

17.    Upon information and belief, Commander Michael's main reason for hiring Ms. Burke was to appear diverse: Ms. Burke became the first and the only African American officer and the first and only female officer in the Park Police.

18.    Additionally, Commander Michael forced Ms. Burke to work in plain clothes for approximately a week after being hired at Park Place instead of the normal uniform that the male officers wore, claiming that no uniforms were available.  Commander Michael also refused to provide Ms. Burke with a bulletproof vest, despite issuing her a duty weapon, even though all of the non-African American male officers had their own bulletproof vests.

19.    Park Place Sergeant Wade Barnhart eventually told Ms. Burke that she would need to scavenge through the men's locker room to see if there was an extra uniform hanging in there so that she could "at least look the part."  Not wanting to be confrontational, Ms. Burke followed this order

3

and formed her own (men's) uniform using an extra men's shirt and a men's pair of pants because Park Place refused to issue her a women's uniform.

20.     Ms. Burke was also eventually given an old bulletproof best by another officer, which she was forced to use even though it was too big.

21.     Upon information and belief, none of the officers who were previously hired (and who were all white and male) ever had problems getting issued a gender-appropriate uniform and a properly-fitted bulletproof vest.

22.     Additionally, Commander Michael would frequently get physical with Ms. Burke, and only Ms. Burke, during the workday.

23.     One example involved Commander Michael sticking his hand all the way down Ms. Burke's pants after she had tried on an extra duty belt he had lying around because he refused to order a new one for her.  Ms. Burke tried the belt on and informed Commander Michael it did not fit.  Under the pretense that he was just checking to see if the belt fit, Commander Michael slid his hand down the small of Mr. Burke's back all the way to the inside rear of her pants and grabbed the belt and shook it repeatedly.  He then commented on how small Ms. Burke's waist was.  This conduct left Ms. Burke speechless and extremely uncomfortable.

24.     The unwanted contact did not stop there, as there were several other occasions when Commander Michael would stand way too close to Ms. Burke and get in her personal space without her consent, and when he would insist on only the two of them going out on rides in his work vehicle during the day.  The non-African American male officers were not subjected to such humiliating treatment.

25.     Another example involved a briefing in April 2015.  The participants of the briefing included Ms. Burke, Commander Michael, Officer Michael Smith, Officer Jeffrey Hampton, and Sergeant Enrique Binyons.  During the briefing, Ms. Burke was standing in between two tables near the back wall.  At the end of the briefing, Commander Michael walked directly over to Ms. Burke (in direct view of the other men) and suggestively grabbed the duty belt around her waist.  After Commander Michael left the room, Ms. Burke could clearly tell that the men who had just witnessed this looked extremely disturbed by Commander Michael's actions.  Ms. Burke reported to them that

4

this was normal protocol for Commander Michael, as he touched her on a daily basis in inappropriate ways, all without her consent.  However, nothing ever came of this complaint, and to Ms. Burke's knowledge, Sergeant Binyons (a supervisor of Ms. Burke's) never reported this up the chain.

26.    On another occasion, Commander Michael unbuttoned his shirt awkwardly in front of Mrs. Burke and other officers under the pretense of "showing off his sunburn," but as the only female officer in this room, this made Ms. Burke feel extremely uncomfortable and she felt like Commander Michael was just looking for an excuse to undress in front of her.

27.    Another example involved Ms. Burke's police certification process, where she needed to complete a fitness test at UNLV.  Commander Michael had asked Ms. Burke if he could join her for the test to offer his "support," but Ms. Burke declined this request.  Commander Michael decided to show up anyway on the Saturday morning of the test (his day off) to supposedly help out, even though there was a proctor present to assist Ms. Burke as necessary during the test.  This made Ms. Burke feel awkward and uncomfortable because Commander Michael was following her around throughout the whole test and getting too close for comfort by counting repetitions, jogging the last lap with Ms. Burke, and giving her water.  Other officers were not subjected to this treatment and found this odd as did Ms. Burke, who did not want to be receiving any kind of different treatment than her co-workers.

28.    Commander Michael also expected Ms. Burke, and only Ms. Burke, to respond to text messages and phone calls back immediately – even on her days off.  Ms. Burke was chastised if she did not respond immediately during her days off, unlike the other non-African American male officers who did not suffer from this treatment.

29.    Due to the supervisor position that Commander Michael held, Ms. Burke felt like she would be putting her job at risk if she were to formally complain in writing about his conduct to upper management.  Further, as her commanding officer, Commander Michael made sure to demonstrate his clout quite often by bragging that he has friends and connections in the government sector, as if to insinuate that Ms. Burke would be defeated if she ever did bring forth a complaint.

30.    Thus, as Ms. Burke's employment at Park Place continued, Commander Michael was relentless in his inappropriate conduct, and it actually got to the point where upon information and

5

belief, Commander Michael thought he was in a special relationship with Ms. Burke which involved Ms. Burke obeying his every order like a wife and instilling special "trust" in him as if they were in a romantic relationship, which they were not.

31.    When Ms. Burke tried to put a stop to Commander Michael's delusion of romance following a disagreement over a write-up, Commander Michael ultimately fired her for not "trusting" him as if they had a special romantic relationship.

### RETALIATION

32.    Ms. Burke was usually afraid to second-guess Mr. Commander Michael, due to his alleged "connections in the county" that he made sure to emphasize to everyone.

33.    However, on or around April 2015, Ms. Burke complained to various officers, including her superior Sergeant Binyons, about Commander Michael's inappropriate behavior.

34.    In fact, these officers directly witnessed Commander Michael putting his hands on Ms. Burke's duty belt in a suggestive manner following a briefing and noticed that the action made Ms. Burke uncomfortable.

35.    Upon information and belief, Ms. Burke's comments were not reported up the chain and no investigation ever commenced into Commander Michael's actions, but instead Commander Michael was informed that Ms. Burke was not consenting to his romantic interests.

36.    Thereafter, Commander Michael wrote Ms. Burke up on or around August 24, 2015 for an incident that her direct supervisor Sergeant Barnhart classified as an "accident" and not Ms. Burke's fault.  Following this incident, Ms. Burke decided that she was not willing to go along with acting like a submissive romantic interest of Commander Michael's.

37.    When Ms. Burke complained about the write-up and demanded that she be treated like the other (non-African American male) officers, Commander Michael got very serious and changed his tone of voice, specifically asking Ms. Burke if she trusted him.  Ms. Burke understood this to mean that Commander Michael thought he was in a romantic "trusting" relationship with Ms. Burke, which of course was not the case.  Accordingly, Ms. Burke indicated that she did not trust him.

38.    Shortly thereafter, Commander Michael became visibly upset and berated Ms. Burke in his office, which is something that the non-African American male officers who spoke their mind

6

were not subjected to, even when it involved write-ups.

39. Ms. Burke felt so threatened that she finally just signed the write-up documents that Commander put in front of her just so she could escape of his office.

40. Days later, on or around August 31, 2015, Ms. Burke was suddenly fired from her position at Park Place, without any actual reason other than her probation period had not expired.

41. Upon information and belief, Park Place actually fired Ms. Burke because she expressed to her supervisor, Commander Michael, that she was no longer going to tolerate being treated differently than her non-African American male coworkers, and informed him that they did not in fact have a romantic "trusting" relationship as he thought.

42. Ms. Burke was discriminated against because of her sex and her race.

43. Ms. Burke suffered from a hostile working environment which severely altered the terms and conditions of her employment.

44. Clark County Park Police is liable, as it failed to take any remedial action.

45. Commander Michael made it clear that it was his way or nothing, so Ms. Burke felt that she had no choice but to comply with his demands.

46. Ms. Burke was retaliated against on or around August 31, 2015 because she did not comply with Commander Michael's expectations that he demanded from an African American female subordinate officer.

47. The retaliation followed merely a week after Ms. Burke voiced concerns over discipline and her lack of belief that Commander Michael was being objective when it came to her.

48. The purported reason for Ms. Burke's termination is clearly disingenuous.

49. Ms. Burke was undoubtedly terminated because she engaged in a protected activity — informing her supervisor that she was not going to tolerate his bizarre delusions about their non-existent romantic "relationship" any longer.

50. Following her termination, Ms. Burke took the additional step of reporting all of the events that had transpired in writing to the Clark County Office of Diversity representative. In a recorded conversation, the Clark County Office of Diversity representative urged Ms. Burke to file a complaint with the EEOC because of the despicable acts of sexual harassment and retaliation that had

7

occurred, even after Park Place was put on notice of what was going on.

**INTERFERENCE WITH PLAINTIFF'S PROSPECTIVE JOB OPPORTUNITIES**

51.    Following Ms. Burke's termination from Park Place, Commander Michael on behalf of Park Place took active steps to interfere with Plaintiff's prospective employment at various companies, including the Nevada Department of Public Safety.

52.    On or around January of 2016, the Nevada Department of Public Safety issued Ms. Burke a conditional officer of employment, which was conditional only on her qualifications and background check coming back positive.

53.    Upon information and belief, Nevada Department of Public Safety contacted Commander Michael from Park Place and inquired as to Ms. Burke's employment at Park Place, which is when Commander Michael sabotaged Ms. Burke's prospective job opportunity by misrepresenting Ms. Burke's history and work ethic at Park Place.

54.    There was no privilege or justification by Park Police for making such misrepresentations.

55.    Actual harm to Ms. Burke has resulted from Park Place's intentional conduct, including the loss of a job opportunity and the inability to gain employment following her termination from Park Place.

56.    Ms. Burke now fears Park Place has effectively blackballed her in the officer community and that her only option will be to move back to Detroit to gain employment again.

**FIRST CLAIM FOR RELIEF**

**Violation of Title VII of the Civil Rights Act – 42 U.S.C § 2000e-2(a)(1) – Unlawful Employment Practice (Sexual Discrimination)**

57.    Plaintiff repeats and realleges the allegations of the preceding paragraphs of the complaint as though fully set forth herein and incorporates the same herein by reference.

58.    Ms. Burke has been subjected to unwelcome conduct because of her sex that unquestionably altered the terms and conditions of her employment.

59.    Park Place created a hostile work environment when it tolerated Commander Michael's inappropriate behavior towards Ms. Burke, including but not limited to obscene comments,

8

inappropriate requests to spend time alone with Ms. Burke, gestures and actions of a sexual nature, and borderline stalking when Ms. Burke took her fitness test.

60. Much of Commander Michael's conduct was sexual in nature.

61. Moreover, this conduct persisted for the entirety of Ms. Burke's employment at Park Police.

62. On at least two occasions, Commander Michael inappropriately grabbed Ms. Burke's duty belt, including on one occasion by physically sliding his hand all the way down the inside of her pants and shaking the belt repeatedly.

63. Commander Michael also treated Ms. Burke differently just because she was a woman, which included refusing to order her a proper woman's uniform, refusing to issue her a proper bulletproof vest and duty belt, and insisting that she wear plain clothes when the other officers got to wear actual uniforms. All of the non-African American male officers were awarded these standard benefits of the job.

64. This obscene and persistent conduct unquestionably was severe or pervasive enough to alter the terms and conditions of Ms. Burke's employment.

65. Park Police is liable for the hostile work environment created by Commander Michael's manager and coworkers because it knew or should have known about the conduct and negligently allowed it to continue.

66. Because Ms. Burke reported this conduct to management, including but not limited to Sergeant Binyons after he had directly witnessed an inappropriate incident, Park Police knew or should have known about the harassment and nonetheless took no reasonable steps to cure or prevent harassment.

67. Therefore, Ms. Burke can demonstrate that Park Police is liable for the creation of a hostile work environment.

68. Park Place's actions were taken with malice and/or with reckless indifferent to Plaintiff's federally-protected rights.

69. Park Place deprived Plaintiff from the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship by failing to rectify the sexually harassing behavior Plaintiff

was subjected to at her place of employment.

70. As a result of Park Police's actions, Ms. Burke has suffered lost wages, mental anguish, inconvenience, and loss of enjoyment of life.

71. As a result of Park Police's actions, it has been necessary for Ms. Burke to retain the services of attorneys and she is entitled to reasonable costs and attorneys' fees.

**SECOND CLAIM FOR RELIEF**

**Violation of VII of the Civil Rights Act; 42 U.S.C § 2000e-2(a)(1) – Unlawful**

**Employment Practice (Racial Discrimination)**

72. Plaintiff repeats and realleges the allegations of the preceding paragraphs of the complaint as though fully set forth herein and incorporates the same herein by reference.

73. As the only African American officer at Park Police department, Ms. Burke was discriminated against by her boss Commander Michael, as he treated her differently and incessantly referred to her as the "black female," or the "black female from Detroit."

74. The other officers in the Park Place department taunted Ms. Burke about Commander Michael's comments, and told her that it meant she was just a token minority who was only hired to add to the diversity status of Park Place.

75. Commander Michael also treated Ms. Burke differently just because she was an African American employee, which included refusing to order her a proper woman's uniform, refusing to issue her a proper bulletproof vest and duty belt, and insisting that she wear plain clothes when the other officers got to wear actual uniforms. All of the non-African American male officers were awarded these standard benefits of the job.

76. Ms. Burke engaged in protected activity when she expressed dismay with her different treatment, based upon her race.

77. Park Place breached its obligation to provide a workplace free from hostility and offensive behavior relating to one's race by failing to act after notice of Commander Michael's offensive and derogatory comments.

78. Park Place's discrimination deprived Plaintiff of employment opportunities and adversely affected her status as an employee.

79. Park Place's actions were taken with malice and/or with reckless indifferent to Plaintiff's federally-protected rights.

80. As a result of Park Police's actions, Ms. Burke has suffered lost wages, mental anguish, inconvenience, and loss of enjoyment of life.

81. Plaintiff is entitled to recover compensatory damage due to the Defendant engaging in unlawful discrimination.

82. Plaintiff is entitled to recover punitive damages because Defendant acted with reckless indifference to federally protected rights of the aggrieved Plaintiff when the Defendant failed to rectify or even acknowledge to unlawful behavior.

83. As a result of Park Police's actions, it has been necessary for Ms. Burke to retain the services of attorneys and she is entitled to reasonable costs and attorneys' fees.

### **THIRD CLAIM FOR RELIEF**

### **Violation of Title VII – 42 U.S.C § 2000e-3(a) – Retaliation**

84. Plaintiff repeats and realleges the allegations of the preceding paragraphs of the complaint as though fully set forth herein and incorporates the same herein by reference.

85. Ms. Burke engaged in a protected activity when she complained to various officers, including her superior Sergeant Binyons, about Commander Michael's inappropriate behavior.

86. However, upon information and belief, Park Place never took up any kind of investigation into Ms. Burke's complaints, and they went ignored.

87. Upon information and belief, Commander Michael learned that Ms. Burke was complaining about his romantic advancements and thereafter decided to pretextually terminate her by writing her up for an incident that her supervisor deemed an "accident" and not her fault.

88. This purported reason for Ms. Burke's write-up was clearly disingenuous and disguised retaliation, as a number of other employees have been in this same situation Ms. Burke was in and received no adverse employment action.

89. Park Police claimed that it terminated Ms. Burke because probationary period had not ended.

90. This purported reason for Ms. Burke's termination is clearly disingenuous.

91.     Rather, Park Police terminated Ms. Burke because of her refusal to go along with Commander Michael's sexual harassment, retaliatory conduct, and the hostile work environment she was enduring.

92.     As soon as Ms. Burke informed Commander Michael that she did not "trust" him and ended his delusion that they were ever in a consensual "trusting" romantic relationship, Commander Michael took immediate steps to terminate Ms. Burke just one week later.

93.     This conduct would have been reasonably likely to deter any employee form engaging in a protected activity, and therefore, was plainly retaliatory in violation of Title VII.

94.     As a result of Park Police's actions, Ms. Burke has suffered lost wages, mental anguish, inconvenience, and loss of enjoyment of life.

95.     As a result of Park Police's actions, it has been necessary for Ms. Burke to retain the services of attorneys and she is entitled to reasonable costs and attorneys' fees.

### FOURTH CLAIM FOR RELIEF

### Violation of NRS 613.330 – Unlawful Deprivation of Employment

96.     Plaintiff repeats and realleges the allegations of the preceding paragraphs of the complaint as though fully set forth herein and incorporates the same herein by reference.

97.     Park Police's discriminated against Burke by subjecting her to, among other discriminatory acts, loss of compensation, and retaliation.

98.     This includes the racial discrimination and sexual harassment mentioned above, which is specifically incorporated by reference herein.

99.     Other similarly situated employees were not exposed to the same discriminatory conduct.

100.     As a result of Park Police's actions, Burke has suffered lost wages, mental anguish, emotional distress, inconvenience, and loss of enjoyment of life.

101.     As a result of Park Police's actions, it has been necessary for Ms. Burke to retain the services of attorneys and she is entitled to reasonable costs and attorneys' fees.

/ / /

/ / /

12

## FIFTH CLAIM FOR RELIEF

### Tortious Interference with Business Relations

102.    Plaintiff repeats and realleges the allegations of the preceding paragraphs of the complaint as though fully set forth herein and incorporates the same herein by reference.

103.    Nevada law disallows intentional interference with someone's business relationship with a third party.  Violators can be held liable and be subjected to payment of actual and punitive damages.

104.    Following her termination from Park Police, Commander Michael, on behalf of Park Police took steps to actively prevent Ms. Burke from obtaining another job.

105.    On or around October 2016, Ms. Burke had a prospective contractual relationship with Nevada Highway Patrol, as the hiring representative indicated that she would be hired as long as her references checked out.

106.    Upon information and belief, Park Police had knowledge of the prospective relationship, and Commander Michael intentionally sabotaged the business relationship by misrepresenting Ms. Burke's history and work ethic at Park Place.

107.    There was no privilege or justification by Park Police for making such misrepresentations.

108.    Actual harm to Ms. Burke has resulted from Park Place's intentional conduct, including the loss of a job opportunity.

109.    As a result of Park Police's actions, Burke has suffered lost wages, mental anguish, emotional distress, inconvenience, and loss of enjoyment of life.

110.    As a result of Park Police's actions, it has been necessary for Ms. Burke to retain the services of attorneys and she is entitled to reasonable costs and attorneys' fees.

### DEMAND FOR JURY TRIAL

111.    Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff invokes her right to trial by jury in this civil action.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

13

1. For a judgment in favor of Plaintiff against Defendants, and each of them, on the complaint and all claims for relief asserted therein;

2. For an award of economic damages in an amount sufficient to make Plaintiff whole for past and future lost income and benefits and other economic losses suffered by Plaintiff resulting from Defendants' conduct;

3. For an award of compensatory damages from mental anguish, emotional distress, pain and suffering, humiliation, harm to reputation, and other losses incurred by Plaintiff as a result of Defendants' conduct;

4. For an award of prejudgment and post-judgment interest;

5. For an award of punitive damages;

6. For an award of Plaintiff's cost of suit incurred herein; and

7. For an award of attorney's fees and related expenses pursuant to § 706(k) of Title VII, 42 U.S.C. § 2000e-5(k) and other corresponding federal law.

8. For an award of such other relief the Court may deem just and proper.

DATED this 1st day of August, 2017.

Respectfully submitted,

**MAIER GUTIERREZ & ASSOCIATES**

_/s/ Danielle J. Barraza_____
JOSEPH A. GUTIERREZ, ESQ.
Nevada Bar No. 9046
DANIELLE J. BARRAZA, ESQ.
Nevada Bar No. 13822
8816 Spanish Ridge Avenue
Las Vegas, Nevada 89148
*Attorneys for Plaintiff Lavanita Burke*

14